**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:13-cv-00106-MR-DLH**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| | ) | |
| **$28,720.00 IN UNITED STATES** | ) | |
| **CURRENCY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court following a bench trial on September 29, 2014.  Upon consideration of the testimony and evidence presented by the Government, the Court hereby enters the following Findings of Fact and Conclusions of Law.

**I.     FINDINGS OF FACT**

**A.     Procedural Background**

The Government initiated this civil *in rem* forfeiture proceeding on April 17, 2013 with the filing of a Verified Complaint.  [Doc. 1].  Fernando Gonzalez ("Gonzalez") and Sandra Isabel Rodriguez ("Rodriguez") (collectively, "Claimants"), through counsel, filed a joint Verified Claim on

May 8, 2013. [Doc. 5]. The Claimants filed an Amended Verified Claim and an Answer on May 29, 2013. [Doc. 7].

The Government submitted a Declaration of Publication on June 18, 2013, advising that a Notice of Civil Forfeiture was posted on an official government internet site for at least 30 consecutive days, beginning on April 25, 2013, as required by Rule G(4)(a)(iv)(C) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. [Doc. 9]. No other claims were filed.

A Pretrial Order was entered on July 25, 2013, setting a discovery deadline of April 1, 2014 and a motions deadline of May 1, 2014, and setting this matter for a bench trial during the September 8, 2014 trial term. [Doc. 11]. On May 1, 2014, the Government filed a motion for summary judgment with respect to Sandra Rodriguez's claim. [Doc. 18]. The Court denied the Government's Motion on July 28, 2014. [Doc. 21].

On September 24, 2014, the Claimants voluntarily dismissed their claims. [Doc. 39]. This matter proceeded to a bench trial on September 29, 2014.

## B. Factual Background

The Verified Complaint, along with the evidence presented by the Government at trial, established the following facts.

On October 23, 2012, at approximately 9:30 p.m., Fernando Gonzalez was driving a 2004 BMW Mini Cooper, VIN WMWRC33494TC49089, in Buncombe County, North Carolina. The BMW Mini Cooper was registered in North Carolina to Sandra Isabel Rodriguez. Roice Figueroa was the only other passenger in the vehicle.

Gonzalez was stopped by Deputy Jason Lambert of the Buncombe County Sheriff's Office for driving erratically and operating a motor vehicle with an inoperable headlight. After issuing Gonzalez a citation for improper equipment, Deputy Lambert requested and was given verbal consent by Gonzalez to search the vehicle. During the search, Deputy Lambert discovered approximately $5,000 in cash in the driver's door pocket.[1] Another bundle of cash, wrapped in rubber bands, was discovered between the driver's seat and the center console of the vehicle in an area in which Deputy Lambert had observed Gonzalez shoving his hands at the beginning of the traffic stop.

Buncombe County Deputy Todd Ernst subsequently arrived on the scene with a canine, "Ryke." Deputy Ernst requested and was given verbal

---

[1] At trial, counsel for the Government repeatedly referred to this money being discovered in the driver's door *panel*, which implies that the money was concealed within the door itself. Deputy Lambert's testimony makes clear, however, that the money was readily visible in the *pocket* of the car door.

consent by Gonzalez to conduct a canine search of the vehicle. At trial, the Government presented the Affidavit of Deputy Ernst [Gov't Ex. C], detailing Ryke's behavior during the traffic stop. Specifically, Deputy Ernst testified that Ryke's normal "final response," indicating the presence of the odor of narcotics, is for him to sit down if the immediate environment allows him to sit down, and that other possible "final responses" are staring and lying down. Deputy Ernst further testified that during the traffic stop, Ryke stared at the spot between the driver's seat and the center console, looked at the deputy, and then stared at the spot again. Deputy Ernst then explained that because of Ryke's position in the car, he could not lie down. Deputy Ernst thus construed Ryke's behavior (staring, looking at his trainer, then staring) as a final response. A bag containing approximately $19,000 in cash was located on the driver's side floorboard. Deputy Ernst also testified in his affidavit regarding Ryke's training and certification. Notably, while Deputy Ernst recounted the various incidents in the past which Ryke positively alerted for narcotics, he does not indicate how many of those alerts were false positives.

A total of $28,720.00 was seized from the vehicle. Of the cash seized, there were 69 hundred-dollar bills, 51 fifty-dollar bills, 948 twenty-dollar bills, 29 ten-dollar bills, and 4 five-dollar bills.

During the stop, Gonzalez told the officers that he was a painter, and that he intended to purchase a house trailer with the funds seized from the vehicle. He further stated that a portion of the currency was from the sale of a Chevrolet Trailblazer, and that the rest of the currency was from a bank loan taken out by his wife. Gonzalez then stated that the loan was from his wife's brother. Gonzalez provided a written statement in Spanish and English which completely translated into English stated: "$29,000.00 with straining and sacrificing for years in order to give the first payment on a house." The passenger, Roice Figueroa, provided a written statement indicating that he had no knowledge of the money in the vehicle. [Gov't Ex. A].

In response to the Government's Special Interrogatories, the Claimants asserted that they were living together and were engaged. They further stated that $20,000.00 of the seized cash was a loan from Rodriguez's father to Gonzalez in October 2012 for the purpose of Gonzalez and Rodriguez purchasing a home; that $6,000 of the seized funds was from the sale of a Chevy Trailblazer that was titled in Rodriguez's name; and that the remainder were funds that Gonzalez had been saving for the past few months prior to the stop. [Gov't Ex. N].

Regarding the $20,000 loan, Gonzalez and Rodriguez presented in response to written requests for production of documents a promissory note signed by Gonzalez and Rodriguez's father, Humberto Rodriguez Beas, and witnessed by two other individuals.[2] The note is dated "10/2/2012." [Gov't Ex. L]. Rodriguez testified that she was not a signatory to this note, was not present when it was purportedly executed, and never saw the note prior to it being produced to the Government. Rodriguez testified that she never had seen the $20,000 proceeds from this loan and that she did not know in what form Gonzalez received the proceeds. [Gov't Ex. J].

As for the $6,000 which came from the sale of the Trailblazer, Rodriguez testified in her deposition that the vehicle had been titled in her name only because Gonzalez could not have anything titled under his name due to his status as an unlawfully present alien. Rodriguez further testified that the vehicle had been sold for cash in July 2012, and that Gonzalez had received the full $6,000 over a period of months prior to the October 23, 2012 stop, although Rodriguez never saw the money. [Gov't

---

[2] The Government attempted to present the deposition testimony of Humberto Beas regarding this loan. [Gov't Ex. K]. The Government, however, failed to establish the unavailability of Beas as a witness pursuant to Fed. R. Civ. P. 32(a)(4). As such, Beas's deposition testimony is inadmissible and shall not be considered.

Ex. J]. The Claimants presented a Bill of Sale in Spanish documenting the sale. [See Gov't Ex. N].

On November 25, 2013, approximately thirteen months after this incident, Gonzalez was stopped by Officer Justin Wilson of the Asheville Police Department for a minor traffic violation. Officer Wilson asked for consent to search the vehicle, which Gonzalez granted. In the glove box of the vehicle, Officer Wilson discovered a total of $4,000, all in twenty dollar bills and wrapped in rubber bands into stacks of $1,000 each. When asked about his occupation, Gonzalez stated that he was a painter and also sold cars. He stated that he last earned $400 from selling a vehicle. When asked about the $4,000 in the glove box, Gonzalez stated that he had obtained the money from selling cars. Gonzalez, however, could not produce a bill of sale for any such transactions.

The Government also presented the testimony of Josue Samuel Amaya-Gamez. Amaya-Gamez was charged in a Bill of Indictment in this District with one count of possession with the intent to distribute marijuana and methamphetamine on December 3, 2013. [Gov't Ex. 34; Criminal Case No. 1:14-cv-00012-MR-DLH, Doc. 1]. Amaya-Gamez pled guilty to this charge pursuant to a written plea agreement, in which he agreed to cooperate with the Government in the prosecution of others. [Criminal

Case No. 1:14-cv-00012-MR-DLH, Doc. 18; Gov't Ex. 35]. Amaya-Gamez testified that he knew Fernando Gonzalez and that prior to his own arrest in December 2013, he saw Gonzalez two or three times a month in order to buy methamphetamine. Amaya-Gamez testified that a few weeks prior to his December 2013 arrest, he had given Gonzalez $4,000 in exchange for methamphetamine.

The Government also presented by affidavit the testimony of Deputy Robert O'Bryant and Sergeant Richard Palmer of the Jackson County, Mississippi Sheriff's Department. They recount in their affidavits that Gonzalez was pulled over for a minor traffic violation in Mississippi on December 13, 2013. During the stop, Gonzalez admitted to having cocaine in the vehicle, and the female passenger with whom Gonzalez was traveling produced a small bag of cocaine from her undergarments. Gonzalez and the female passenger were subsequently charged with possession of cocaine. [Gov't Exs. E, F]. While that charge was pending, Gonzalez was granted voluntary departure from the United States on February 4, 2014. [Gov't Ex. H].

## II. CONCLUSIONS OF LAW

Pursuant to 21 U.S.C. § 881, any "moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by

any person in exchange for a controlled substance or listed chemical . . ., all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate" a drug trafficking crime are subject to forfeiture to the United States. 21 U.S.C. § 881(a)(6). It is pursuant to this provision that the Government seeks forfeiture of the $28,720.00 in United States currency seized during the October 23, 2012 traffic stop of Gonzalez and Figueroa.

In a civil forfeiture case, the Government bears the initial burden of establishing by a preponderance of the evidence that the subject property is subject to forfeiture. 18 U.S.C. § 983(c)(1); United States v. Sims, __ F. App'x __, 2014 WL 3377689, at *1 (4th Cir. July 11, 2014) (per curiam). Further, "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). Once the Government has presented its *prima facie* case, the burden then shifts to the claimant to demonstrate that he or she is an innocent owner of the property. See United States v. Munson, 477 F. App'x 57, 65-66 (4th Cir.), cert. denied, 133 S.Ct. 315 (2012).

In arguing that the subject property is forfeitable, the Government cites to nine factors which it contends are relevant to determining forfeitability of currency in most cases: (1) the existence of a large amount of cash in an unusual place; (2) unusual bundling and/or packaging; (3) the presence of a large amount of "drug" denominations; (4) a positive "dog sniff"; (5) the lack of believability of the claimant's explanation; (6) the financial ability of the person from whom the funds were seized; (7) other drug activities or convictions; (8) the amount of drugs seized; and (9) the concealment of the funds. The Court will address each of these factors in turn.

**Amount of Drugs Seized**

There were no narcotics discovered in the vehicle, and neither Gonzalez nor his passenger was charged with any drug trafficking crime as a result of the traffic stop. The Government concedes that this factor does not support its claim for forfeiture.

**Large of Amount of Cash in "Unusual Place"/Concealment**

In arguing that the seized cash is forfeitable, the Government places particular emphasis on the large amount of the money discovered and the manner in which it was kept, namely that it was stashed in various places throughout the vehicle. The amount of the cash seized, by itself, is

probative of nothing. The Government's evidence established that the person in possession of these funds, Fernando Gonzalez, was in the country illegally. He claimed that he received these funds from three separate sources: a $20,000 cash loan from his father-in-law, the proceeds of a sale of a vehicle, and income from painting and other remodeling jobs. There was no evidence presented that he possessed any type of bank account, nor could there likely be any such evidence, as Gonzalez's status as an unlawfully present alien would preclude him from having the type of documentation necessary to open such an account. Even if Gonzalez had a bank account in which he could have deposited these funds, the amount of cash at issue would have been extremely difficult to deposit, as banks usually refuse to permit, or at least discourage, such large deposits of cash. Further, if he had attempted to make multiple smaller deposits, he would have run the risk of being accused of structuring his deposits in contravention of federal law. Further, while the Government maintains that carrying large amounts of cash is "not normal," it is not unusual for a person, such as an unlawfully present alien who is unable to deposit funds in a secure location, to keep such funds on his or her person, in a vehicle, or in a location in his or her residence. Thus, the fact that a large amount

of cash was discovered stashed in various places in a car is itself not indicative of any illicit drug activity.[3]

As the Court previously noted, the discovery of a large amount of money in a consensual search of a vehicle during a routine traffic stop, without more, is simply insufficient to establish a substantial connection between those funds and a drug trafficking crime. See United States v. $405,089.23 in United States Currency, 122 F.3d 1285, 1290 (9th Cir. 1997) ("[T]he test requires more than the mere existence of a large amount of cash to establish a connection between that cash and illegal drug transactions; the money must be 'in combination with other persuasive circumstantial evidence'") (quoting United States v. Padilla, 888 F.2d 642, 644 (9th Cir. 1989)). Here, the possession of the quantity of currency found is probative only of the possessor's status as an unlawfully present alien, not of any drug trafficking. Accordingly, the evidence presented with regard to these factors is insufficient to weigh in favor of forfeiture.

---

[3] The Government also emphasizes the fact that Gonzalez was observed stuffing his hands between the driver's seat and the console (the area where part of the funds were discovered) as the officer approached the vehicle. The Government argues that this act of concealment is evidence that the money was illegally obtained. The Court notes, however, that another bundle of the cash was readily visible in the pocket of the driver's side door and thus was not concealed from the officer's view.

## Unusual Bundling and/or Packaging and "Drug" Denominations

The Government also emphasizes the facts that the seized cash was bundled and that the cash consisted largely of twenty-dollar bills as being consistent with and indicative of drug trafficking. The mere fact that the money was bundled in stacks with rubber bands, however, is not evidence that the money was the product of illicit drug activity; it is merely probative of the fact that the money was obtained as a result of a cash transaction. Further, while evidence of possession of a large amount of money in lower denominations of bills may "help[ ] to establish a 'substantial connection' to drug trafficking," United States v. Puche-Garcia, No. 99-1612, 2000 WL 1288181, at *4 (4th Cir. Sept. 13, 2000), it is certainly not dispositive of the issue. Gonzalez claimed that the majority of the money ($20,000) was the result of a loan from Sandra Rodriguez's father, who operates several local Mexican restaurants. It would not be unusual for a restaurant owner to be in possession of a large sum of cash, as a restaurant can be a largely cash-based business. It further would not be unusual for that cash to be largely in twenty-dollar denominations, as that is a denomination commonly used to purchase food. While the Government repeatedly contended at trial that the prevalence of twenty-dollar denominations in the seized cash was not "normal," it failed to identify what distribution of denominations of

legal tender the Government asserts would be "normal" for a person to possess. Accordingly, these factors do not weigh in favor of forfeiture in this case.

**The Dog Sniff**

The Government also relies on evidence that the canine, "Ryke," positively alerted in Gonzalez's vehicle.[4] This positive dog alert, however, is of minimum probative value. According to Deputy Ernst's affidavit, Ryke did not demonstrate a normal final response indicating the presence of the odor of narcotics; rather, Deputy Ernst *construed* Ryke's conduct (staring and looking at his handler) as conduct indicating a final response.[5] Further, while the Government presented evidence to establish Ryke's training and certification in narcotics detection, there was no evidence presented regarding the accuracy of his prior alerts. Given the nature of the dog's indication and the lack of evidence regarding his accuracy, the credibility of

---

[4] The Government's Verified Complaint also cites a second canine alert, days after the search, which occurred at the Buncombe County Sheriff's Department. The Government, however, did not raise this alert at trial and offered no evidence regarding this second dog's training, certification, and/or accuracy. Accordingly, the Court will not consider this second canine alert in determining whether there is a substantial connection between the defendant property and any illicit activity.

[5] As this Court has previously noted there is a split in the Circuits as to whether a change of behavior other than the dog's trained indication constitutes probable cause to search a vehicle for contraband. See United States v. Wilson, 995 F.Supp.2d 455, 473-74 (W.D.N.C. 2014) (discussing cases).

this dog alert is questionable.  As such, this factor does not weigh in favor of forfeiture in this case.

## Believability of Explanation/Financial Ability

Next, the Government argues that Gonzalez's dubious explanations for the source of the cash, as well as the information provided regarding his lack of income and his failure to file income tax returns, all indicate that the cash was likely derived from illegal activity.

Prior to withdrawing their claims, Rodriguez and Gonzalez submitted documentary evidence of the $20,000 loan from Humberto Beas to Gonzalez, as well as a bill of sale for the Chevy Trailblazer.  Gonzalez explained that the remainder of the funds were derived from his employment as a painter and remodeler.  It is unsurprising that as an unlawfully present alien, Gonzalez would not have filed income tax returns on this income.

While the Claimants presented evidence indicating a legitimate source for the cash, they have now withdrawn their claims to such property. The withdrawal of such claims constitutes a consent to the forfeiture of the funds and is at least an implicit concession that there is a valid basis for forfeiture.  Accordingly, this factor weighs in favor of forfeiture.

**Other Drug Activities**

Finally, the Government relies upon evidence of other drug activities or convictions to justify forfeiture of the subject property. Specifically, the Government relies on evidence regarding Gonzalez's arrest in Mississippi for possession of cocaine as well as the testimony of a cooperating witness to establish that Gonzalez was engaged in unlawful drug trafficking at the time of the October 2012 traffic stop.

The Court finds Gonzalez's arrest to be of limited probative value. This incident occurred in Mississippi in November 2013, thirteen months after the stop in question in Asheville, North Carolina. This arrest therefore is not temporally or geographically related to this event. The testimony of Amaya-Gamez, however, is probative of Gonzalez's illicit conduct during the relevant time period. Amaya-Gamez testified that he regularly saw Gonzalez two or three times a month in order to buy methamphetamine, and that he had given Gonzalez $4,000 in exchange for methamphetamine in November 2013, money which was later discovered in another traffic stop. This testimony raises a reasonable inference that Gonzalez was engaged in narcotics trafficking and that the cash discovered during the October 23, 2012 was in fact the proceeds of that illicit activity.

### III.    CONCLUSION

Based on the foregoing, the Court finds as fact, by a preponderance of the evidence, that the currency seized during the October 23, 2012 traffic stop of Fernando Gonzalez had been furnished in exchange for controlled substances and that the defendant currency constitutes proceeds of a drug trafficking crime.  Therefore, the Court concludes as a matter of law that the defendant currency is subject to forfeiture pursuant to 21 U.S.C. § 881.

### O R D E R

**IT IS, THEREFORE, ORDERED** that a Judgment of Forfeiture shall be entered in favor of the United States against all persons and entities in the world against the Defendant Property $28,720.00 in United States Currency.

**IT IS FURTHER ORDERED** that any right, title and interest of all persons in the world in or to the Defendant Property is hereby forfeited to the United States, and no other right, title, or interest shall exist therein.

**IT IS FURTHER ORDERED** that the United States Marshal is hereby directed to dispose of the forfeited Defendant Property as provided by law.

A Judgment consistent with this Memorandum of Decision and Order shall be filed contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: October 20, 2014

Martin Reidinger
United States District Judge